UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO. 20-cr-10252-LTS |
| | ) | |
| | ) | |
| RAUGHN WILLIAMS | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant, Raughn Williams, entered a guilty plea to a single-count indictment charging him with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922 (g)(1). For the reasons that follow, Mr. Williams requests that this Court impose a sentence of 30 months to run concurrent with the Massachusetts state sentence that he is currently serving on the following matter: Dorchester District Court Docket No. 1607CR002742 (2 years committed imposed on May 5, 2021).[1] *See* Presentence Report ("PSR") ¶ 42. The proposed sentence would include a period of supervised release of 3 years and is sufficient, but not greater than necessary, to effectuate the considerations set forth in 18 U.S.C. § 3553(a). Mr. Williams respectfully submits this memorandum to assist the Court with sentencing.

I.   Defendant's Background

Raughn Williams, now 23 years old, provides this Court with yet another unfortunate example of a young man of color that has been surrounded with misfortune and negative influences since the time of his birth. The circumstances of his early years tick all off the boxes for an "at risk" child and teenager who was on a collision course with the adult criminal justice

---

[1] The state District Court judge ordered that this 2 year probation violation sentence was to run concurrent with whatever sentence this Court imposes on the federal felon in possession of a firearm and ammunition case. *See* "PSR" ¶ 42.

1

system.  From the age of 3 months, Mr. Williams lived with a physically abusive (and likely mentally ill) father who has no relationship with him now because of disinterest and the amount of time he has spent in prison.  *See* PSR ¶ 56.  That father victimized his mother, his siblings, and caused Mr. Williams himself to require medical attention on at least one documented occasion as a child.  *See* PSR ¶ 53.

Although Mr. Williams' mother had made significant efforts to get all of her children the resources necessary to keep them insulated from the crime and the violence they were consistently exposed to in the area of Dorchester where they lived, it proved to be a losing battle. She was a single parent working to support her children and was outside of the house for extended periods of time.  As result, the children were left alone and without any supervision. Mr. Williams has a younger sister who is incarcerated in Maine on drug-related charges and a younger brother who is involved with the Massachusetts Department of Youth Services ("DYS").  *See* PSR ¶¶ 58, 61.

Mr. Williams himself has had a significant involvement with the Massachusetts Department of Children and Families ("DCF") and DYS because of a lack of parental support during his formative years.  Barbara Davis, his paternal grandmother, was his legal guardian at one point according to DYS records.  When Mr. Williams was 16, she filed a Child Requiring Assistance complaint describing that he had broken into someone's home and stolen some items. *See* PSR ¶ 53.  This resulted in "drug dealers" showing up at his mother's home looking for him. *Id.*  Sadly, he was living a chaotic life at the age of 16 and he was acting out because he was largely on his own.

In addition to the involvement of DCF and DYS in his life, Mr. Williams was dealing with other deficits in terms of his mental and physical health.  This included diagnoses of

2

attention deficit disorder and hyperactivity ("ADHD") and anxiety at the age of 10. *See* PSR ¶ 68. The ADHD was treated with medication until Mr. Williams was 14 but then he stopped. He didn't like the way the medication made him feel. *Id.* Although not confirmed by any medical professional, these conditions likely still affect his behavior to the present day.

As to his physical health, records retrieved by the Probation Department confirm that he suffers from a disorder that causes seizures and he has asthma. *See* PSR ¶ 66. The seizures may be a result of a head injury suffered in a motorcycle accident in 2018. The asthma condition is of particular concern given the Coronavirus pandemic. This condition makes him more vulnerable to serious physical complications should he contract the virus. As of the date of the submission of this memorandum, Mr. Williams has not yet received a vaccination for Covid-19. This is not because of a lack of access to the vaccine at the Plymouth County Correctional Facility ("Plymouth") but because of a fear he has regarding taking the vaccine. Regardless of what information or belief his hesitation is based upon, it is uncontroverted that remaining in a prison setting for an extended period places him at greater risk of exposure to serious illness.

Insurmountable family problems, substance abuse, and mental health issues have contributed mightily to Mr. Williams' criminal history. As will be argued below, that criminal history is overstated given his involvement with the juvenile justice system as a teenager and its substantial effect on the guidelines calculation. The offense conduct in this case, carrying a gun illegally for his own protection, was motivated by long-standing fears harbored by Mr. Williams given the environment in which he was raised. He recognizes the wrongfulness of his actions and understands that he cannot continue living in this way. His most recent arrest has put a stop to all of it for the time being. He is now prepared to spend an additional, and substantial, period

of time in prison as a consequence. He truly wants to better himself but he clearly needs more assistance than what DCF, DYS, and the state court system have offered him thus far.

II.     The Guideline Range Applicable In This Case

After further consultation with Mr. Williams, he will withdraw various objections made to the PSR guidelines assessment and suggests that the following calculation is correct and should apply in his case:

- A base offense level of 20, pursuant to § 2K2.1(a)(4), as Mr. Williams does have a prior Massachusetts conviction for Assault by means of a Dangerous Weapon ("ADW") which is, categorically, a crime of violence [2];

- A 3-level reduction pursuant to § 3E1.1 (a) and (b), rendering a final offense level of 17.

Although he will argue below that it is overstated, Mr. Williams agrees with the United States Probation Department's conclusion that his criminal history category ("CHC") is VI, which at a total offense level of 17 results in a guideline range of 51-63 months.

III.    **A sentence of 30 months run concurrent with Mr. Williams' state sentence would be reasonable under the circumstances, and is sufficient but no greater than necessary to satisfy the considerations proposed by 18 U.S.C. § 3553(a) .**

Although Mr. Williams is not pursuing various PSR objections previously made regarding the offense level determination and the criminal history assessment, he persists in two

---

[2] Mr. Williams had submitted a written objection to the PSR stating that setting a base offense level of 20 was not correct and that it should have been 14 as he was a "prohibited person" at the time of the offense conduct per §2K2.1(a)(6). *See also*, Plea Agreement, Docket Entry 38 (paragraph 3 (a)). The basis of the objection was tied to the summary of the offense conduct underlying the state conviction for assault by means of a dangerous weapon ("ADW") in paragraph 42 of the PSR. That summary arguably fails to make out the elements of the offense per Massachusetts G.L. c. 265 § 15(b) in that there is no clear description contained therein of Mr. Williams pointing a handgun at anyone. Defense counsel has retrieved and reviewed all of the docket paperwork from Dorchester District Court related to that case and there is additional detail contained in a police incident report (that is not in the PSR summary) that likely supported a guilty plea to ADW (a witness, not the victim in the case, stated he "pulled a gun" to police officers). Lastly, ADW is categorically a "crime of violence" per *United States v. Whindleton*, 797 F.3d 105 (1st Cir. 2015). For purposes of determining the appropriate base offense level under the guidelines, the fact of the conviction alone (regardless of the factual summary underlying the incident) is sufficient.

arguments that reduce his guidelines sentencing range to a level more appropriate to his personal circumstances. Also, Mr. Williams is currently in primary federal custody at Plymouth. That has been his status since the date of his guilty plea in this Court on June 22, 2021. *See* PSR ¶ 42. Prior to that, he was in Massachusetts state custody for a considerable period of time and had been sentenced to 2 years of imprisonment in Dorchester District Court on May 5, 2021 for a probation violation. *Id.* Despite Mr. Williams being in federal custody at the moment, the state sentence described is currently running as the Dorchester District Court judge ordered that the state sentence be run concurrent with whatever sentence Mr. Williams received on this federal case. *Id.*

This Court has the authority to order that any sentence imposed in his federal case run concurrent with any state sentence(s) he may currently be serving. Although, as a practical matter, the Bureau of Prisons ("BOP") is likely to credit Mr. Williams for every day that he has been in federal custody since June 22, 2021, he still asks that the federal judgment order in this case read that his sentence is to run concurrent with the sentence imposed in Dorchester District Court case docket number 1607CR002742. As unlikely as it may be at this point, this wording will avoid any possibility of the BOP treating the federal sentence as running consecutive to the state sentence that is currently running.

### A. Mr. Williams was ingesting the cocaine found in his possession and no further enhancement of the base offense level is necessary.

Mr. Williams submitted a written objection to the Probation Department's inclusion of a 4 level enhancement under § 2K2.1(b)(6)(B). As the government states in its sentencing memorandum, an evidentiary hearing on this point is not necessary as the Court can make a determination on the facts presented. Defense counsel will present the Court with additional

5

facts in this argument that are not contained in the PSR that the government is not going to dispute. The PSR states that Mr. Williams "possessed the firearm" in connection with the felony offense of "possession of a controlled substance with intent to distribute that substance". *See* PSR ¶ 27. In support of that enhancement, the PSR cites to paragraphs 14, 18, and 19. *Id*. Paragraph 14 references a post-arrest statement made to the Boston Police where Mr. Williams says the following: "I had crack on me and no license, bro." This statement, in and of itself, is an admission that Mr. Williams knowingly possessed crack cocaine but not necessarily that intended to sell it or give it to someone else.

Paragraph 18 is simply a description of the drug evidence found in Mr. Williams' possession. The total amount of cocaine base was relatively small (10 grams) and as such, it is arguably just as consistent with personal use as it is with any intent to distribute. Paragraph 19 does no more to support an argument that Mr. Williams intended to distribute cocaine. In fact, it provides more evidence that he possessed it for personal use. It describes Mr. Williams being released from the hospital "against medical advice" after the treating physician expressed concerns when an "abnormality" was noted in his bloodwork indicating that he had recently used/ingested cocaine. PSR ¶ 19.

In its response to Mr. Williams' objection, the Probation Department references two additional paragraphs in the PSR (20 and 21) which were not cited to in the first draft of the report when discussing an enhancement under §2K2.1(b)(6)(B). In paragraph 20, Mr. Williams is quoted as having stated the following at the police department during a telephone call "Yo, they found my fucking heat and my fucking work." Although no further explanation is given in the reply as to why this statement is supportive of an intent to distribute the cocaine Mr. William's possessed, defense counsel assumes the Probation Officer is applying a particular

6

meaning to the terms "heat" and "work" that are based on his personal understanding of street slang. The government follows suit in its sentencing memorandum. Unless a more detailed explanation with references to common understandings of slang words is offered either from a reputed source, defense counsel objects to such a bare bones assertion as a reply. Defense counsel still contends that an evidentiary hearing is not necessary for this purpose as the government can certainly proffer information to the Court at the upcoming sentencing hearing on its basis of knowledge with regard to the highlighted terms and the Court can assess the information that has been presented.

Paragraph 21 offers a more substantial, yet not necessarily supportive, contribution to the argument over Mr. Williams' intent in possessing the cocaine. Two scales and several empty plastic bags with white powdery residue were found in the car that Mr. Williams admitted he was driving. The empty bags with residue are easy to explain as they are evidence of the cocaine Mr. Williams ingested that required him to be taken to a hospital after his arrest. The scales, although potentially supportive of an intent to distribute, are not presented to the Court along with *all* of the relevant facts available to the Boston Police at the time of the arrest. *Emphasis added*. Thus this information is presented out of context.

When the car that Mr. Williams was driving in came to a stop in Chelsea, witnesses observed *two men get out of the car and leave the area*. *Emphasis added, See Attached Exhibit A*, Chelsea Police incident report. One was a black male whose physical build and clothing matched Mr. Williams. The other was a shorter Hispanic man with his hair pulled back into a ponytail. That man was never apprehended by the police but Mr. Williams was likely asked about him given his response to questioning officers that he was not a "rat" because rats get "killed". That man could have been the person who delivered Mr. Williams the crack cocaine

7

found in the car.  He could have been the owner of the majority of the crack cocaine and the scales found in the car but beat a hasty retreat once the two men ditched the car in Chelsea.

The weight of the evidence confirms that Mr. Williams used some of the crack cocaine found in his possession and that is not typical of people who sell drugs to make money.  Neither can the government or Probation point to Mr. Williams' denial of recent drug abuse in the PSR as evidence of an intent to distribute.  *See* PSR ¶ 70.  Defense counsel advised Mr. Williams not to discuss drug use related to the offense conduct during his presentence interview.  Viewed in the light most favorable to the government and Probation, the evidence is arguably in equipoise on the intent issue.  As such, a 4 level enhancement is not warranted even under a preponderance standard.

**B. Although correct, the criminal history category determined by the Probation Department is substantially attributable to juvenile offenses and therefore overstated.**

Mr. Williams is withdrawing his formal written objection related to the scoring of the juvenile convictions listed in his criminal history.  He agrees that the entries are properly scored as 2 points each, as opposed to 1 point, since the legal standard for what is considered juvenile "confinement" under § 4A1.2(d)(2)(A) appears to encompass not only DYS "hardware secure" facilities but also, all forms of facilities that cover DYS placements including community-based programs and reentry centers.  Thus the majority of placements utilized by the Massachusetts DYS system for committed youths, even though not locked facilities or programs, can later be utilized to penalize those individuals who are convicted of offenses in federal court as a guidelines enhancement.  In this case, that included the S.T.R.I.V.E. residential program at which Mr. Williams spent a considerable amount of time during his DYS commitment between January of 2015 and January of 2016.  *See* PSR, pp. 8, Note 1.

Under § 4A1.3(b)(1) of the guidelines, if reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted. In this case, Mr. Williams' total criminal history score is 14 which places him in the highest criminal history category on the sentencing table, VI. *See* PSR 46. Out the 14 point total, 6 are attributable to his juvenile cases. *See* PSR ¶¶ 37, 40, 41. This is 43% of his criminal history score and it gets him to a 51-63 month range as calculated in this memorandum.[3]

In terms of the timing of the juvenile offenses and the severity of the individual cases themselves, they all took place within the span of 7 months in 2014 when Mr. Williams was 16 years old. *Id.* As to the nature of the offenses charged: the first involved shoplifting $100 worth of merchandise from a Macy's store; the second involved an assault and battery where he and two other kids tried to take something from another juvenile; and the third involved a charge of assaulting a police officer when he was approached by officers trying to execute an arrest warrant and he struggled to get away from them. *Id.* This relatively quick string of outbursts from a non-medicated teen with ADHD who had very little adult supervision is serious, but not in any way surprising, given the circumstances Mr. Williams found himself in.

A consideration of these facts leads to the clear conclusion that a category VI assessment substantially overstates the seriousness of Mr. Williams' criminal history when over 40% of the cases used to get there are the petty juvenile matters described. A more accurate reflection of

---

[3] With the addition of the 4 level enhancement to the base offense level for possession of a firearm in connection with another felony offense, at a CHC VI, the guidelines range calculated by the Probation Department is 77-96 months. Utilizing a base offense level of 14, the government declared that Mr. Williams' range was 41-51 months in the plea agreement submitted to the Court prior to the Rule 11 hearing in this case. *See* PSR ¶ 80.

9

Mr. Williams' criminal history category would come from treating those cases, not as 2 criminal history points, but by eliminating them from the score entirely and only dealing with his adult record. That would give us 8 total points and places him in category IV. At a total offense level of 17 and a CHC IV, the guidelines range would be 37-46 months which is much closer to the range arrived at by the parties in the plea agreement presented to the Court. The government urges the Court to impose a 41-month sentence in its memorandum as that was its determination of what an appropriate sentence would be for Mr. Williams given his unique personal history and characteristics.

      **C. A 30 month sentence, albeit lower than the 37-46 month range calculated with a criminal history departure, is a just punishment for Mr. Williams.**

The dangerous conduct highlighted in this case in terms of possessing a gun, trying to evade the police in a car at a high rate of speed, and possessing and using crack cocaine is certainly troubling. It creates serious risks both for Mr. Williams in terms of his personal health and for the public in general. Thankfully in this instance, but for some property damage to an unoccupied parked car, no one was physically harmed. Similarly, police officers saw the physical distress that Mr. Williams was experiencing from using crack cocaine and got him to a hospital for treatment immediately. Although remorseful over his conduct, he is glad that no one was hurt as a result of his actions and that his health was protected. He does not want to continue living in chaos. He wishes to be a father to his infant daughter, now 6 months old, who he has not even been able to spend time with outside of jail.

      Ideally, Mr. Williams would like to begin a new life with his family away from Massachusetts and from all of the negative associations related with Dorchester and Boston. This includes living in a neighborhood where violence and drug use are commonplace. He also

dislikes the feeling of always being vigilant because someone might harm him for any reason. Thus, the desire to carry a gun for self-protection. He is also wary around the local police, who are now familiar with him, and could at any moment decide they want to roust him for walking or driving in a particular area. His dream is to leave all of this behind.

When Mr. Williams was 18, he traveled to North Carolina for a short time to get away from the problems he had experienced in Boston. He connected with and Aunt who has connections to people who do legitimate work in the music and entertainment industry. He would very much like to use her as a resource so he might eventually get a job in that field. He does not wish to spend the rest of his life revolving in and out of prison or dead from using drugs.

A 30-month sentence satisfies the factors the Court must consider in determining a reasonable punishment for Mr. Williams. Granted, his track record thus far has not been good as an adult. This is his second firearm-related offense and he was on state probation at the time of the conduct. With the resulting state probation violation in May of 2021, he has now been sentenced to 4 years in jail, in total, for the same criminal case. *See* PSR ¶ 42. Still, the 30-month sentence proposed for this matter would be the longest sentence he has ever received and, assuming the Court orders a concurrent sentence, will overlap with his 2-year state sentence by approximately 24 months. He would then be on supervised release for 3 years, during which the Probation Department can assist him with reassessing his need for treatment for ADHD, stabilize his living situation and offer resources to help with substance abuse. This will support his motivation to achieve his goals of being a good father, exploring new employment opportunities and staying out of trouble with the legal system. He is still a very young man and can use this

sentence as an opportunity to attempt to finally begin to heal a life that has been traumatic and painful for far too long.

## Conclusion

For the foregoing reasons, Mr. Williams respectfully asks the Court to impose a sentence of imprisonment of 30 months, to run concurrent with the state sentence he is currently serving, with a period of 3 years of supervised release to follow. This period of supervision should be the focal point of the sentence as it will allow Mr. Williams access to consistent mental health and substance abuse treatment services which is what he certainly needs to increase his chances of success. The suggested term of incarceration will provide punishment that is sufficient, but no greater than necessary, to achieve the statutory purposes of sentencing in this case. *See* 18 U.S.C. § 3553(a).

RESPECTFULLY SUBMITTED,

RAUGHN WILLIAMS
By His Attorney,

*/s/ Oscar Cruz, Jr.*
Oscar Cruz, Jr.
B.B.O. #630813
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Oscar Cruz, Jr., hereby certify that this document filed through the ECF system will be sent electronically to the registered participant, as identified on the Notice of Electronic Filing (NEF) on November 16, 2021.

*/s/ Oscar Cruz, Jr.*
Oscar Cruz, Jr.